# EXHIBIT 7

```
 1                     UNITED STATES OF AMERICA
 2              BEFORE THE FEDERAL TRADE COMMISSION
 3
 4   In the Matter of                    )
 5   UNITED STATES OF AMERICA,           )
 6   V.                                  )  Docket No. C-4316
 7   TWITTER, INC.                       )
 8                                       )
 9        ------------------------)
10
11                                 Wednesday, June 21, 2023
12                                 Via Zoom videoconference
13
14                 The above-entitled matter came on for
15   deposition, pursuant to notice, at 12:30 p.m. Eastern,
16   for the testimony of:
17
18                         DAVID ROQUE
19
20
21
22   Reported by:  DEBORAH WEHR, RPR
23
24
25
```

  1   are ready.  I was pointing out the questions are
  2   pending.  If you are saying these are all
  3   attorney-client privileged matters, I understand that,
  4   and I appreciate that clarification.
  5          MS. VANDRUFF:  Happy to.  Ms. Wehr, if you will
  6   read the question back to Mr. Roque.
  7          (The record was read as requested.)
  8          MS. VANDRUFF:  And my instruction was that this
  9   was vague and lacks foundation.
 10          Mr. Roque, you can answer the question.
 11          THE WITNESS:  As we were moving forward with
 12   this engagement, we had ongoing discussions with the
 13   FTC.  And during those discussions, the FTC kept
 14   expressing their opinion more and more adamantly about
 15   the extent of procedures Ernst & Young would need to
 16   perform based on their expectations.  And there was
 17   also expectations around the results they would expect
 18   us to find based on the information Twitter had already
 19   provided to the FTC and the FTC had reviewed.
 20          I raised a personal concern that I felt as if
 21   the FTC was trying to influence the outcome of the
 22   engagement before it had started, and I was trying to
 23   make sure that the way the conversations with the FTC
 24   were transpiring we didn't have an adverse threat from
 25   an independent interest.  In other words, was there

1   somebody outside of the arrangement we had with Twitter
2   trying to influence the outcome of our results.
3          BY MS. COLLESANO:
4      Q.  In the conversations that you had with the FTC,
5   was the focus on getting appropriate information to
6   make sure that the program mandated under the order was
7   operating effectively?
8      A.  Yes.
9          MS. COLLESANO:  Ms. VanDruff, I'm finished with
10  this exhibit if you want to take that break now.
11         MS. VANDRUFF:  I do.  If you don't have
12  follow-up questions about Exhibit 9, that would be
13  helpful.  Thank you.
14         MS. COLLESANO:  How long would you like?
15         MS. VANDRUFF:  Five minutes would be helpful.
16         MR. KOFFMANN:  Can we make it ten minutes, if
17  you don't mind.
18         MS. COLLESANO:  Sure.
19         (A recess was taken.)
20         BY MS. COLLESANO:
21     Q.  I was trying to get you a break, I'm sorry if
22  we went a little long.  You can just stop me.  I'm
23  happy to take breaks when you guys need them.
24         Just going back to Exhibit 9, on the third page
25  near the bottom at 8:28 p.m., you say, "I was thinking

Roque

USA v. Twitter, Inc.                                           6/21/2023

```
 1   EY interests are not aligned with Twitter anymore
 2   because of the FTC."  What did you mean by that?
 3        A.   Before the break, I was just personally getting
 4   concerned that our obligation under our contract is to
 5   go in and do the independent assessor report and then
 6   report the facts based on the results.  In some of the
 7   discussions that we were having with the FTC,
 8   expectations were being conveyed about what those
 9   results should be before we had even begun any
10   procedures, and I was concerned that there was this
11   adversarial situation occurring where you had two
12   competing parties that, stepping back, both had a
13   desire for a certain outcome to occur that may not have
14   always been aligned.
15        Q.   It seems to implicate that at least at one
16   point you thought EY's interests were aligned with
17   Twitter.
18        A.   No.  That was not the intent to say I had an
19   allegiance or alignment with any entity.
20        Q.   To be clear, no one from the FTC directed you
21   to reach a particular conclusion about Twitter's
22   program, correct?
23        A.   There was suggestions of what they would expect
24   the outcome to be.
25        Q.   Did the FTC convey concerns about the level of
```

1  change at Twitter and things that had been revealed
2  through the press that --
3     A.  The -- sorry, you instructed me not to talk
4  over you.  I apologize.
5          MS. VANDRUFF:  Anne, I apologize.  Would you
6  like to restate your question?
7          MS. COLLESANO:  If Mr. Roque had something to
8  say, I'm happy to let him make his statement.
9          THE WITNESS:  No, just finish your question so
10 I can make sure I answer it correctly.
11         MS. COLLESANO:  Deborah, can you read back what
12 I said, please.
13         (The record was read as requested.)
14         BY MS. COLLESANO:
15    Q.  That were developing and that the FTC would
16 want to make sure EY examined in its assessment of
17 Twitter's program?
18    A.  Yes.
19    Q.  I believe you testified earlier that you were
20 also reading news reports in November of 2022 and had
21 concerns as well; is that correct?
22         MS. VANDRUFF:  Objection.  Mischaracterizes
23 prior testimony.
24         You may answer the question.
25         THE WITNESS:  I don't know that I had concerns.

1   There was just a lot going on that we were trying to
2   figure out what was fact from fiction.
3           BY MS. COLLESANO:
4       Q.  And a lot of these changes -- a lot of these
5   changes created more work for EY in the assessment,
6   correct?  More that needed to be reviewed?
7       A.  I don't know for sure since we didn't do the
8   work.  The amount of change did require more work in
9   just trying to understand the impact of that change.
10      Q.  No one from the FTC actually told you what EY's
11  report should say in its conclusions, correct?
12          MS. VANDRUFF:  Objection.  Leading.
13          You may answer the question.
14          THE WITNESS:  There was a conversation where it
15  was conveyed that the FTC would be surprised if there
16  was areas on our report that didn't have findings based
17  on information the FTC was already aware of, and if
18  Ernst & Young didn't have findings in those areas, we
19  should expect the FTC would follow up very
20  significantly to understand why we didn't have similar
21  conclusions.
22          BY MS. COLLESANO:
23      Q.  I'm going to show you another document.
24          (Roque Deposition Exhibit Number 10 was marked
25  for identification.)

Roque

USA v. Twitter, Inc.                                             6/21/2023

```
 1    impression that you characterized earlier about their
 2    expectation about the outcome of the order assessment
 3    that Ernst & Young was conducting?
 4            MS. COLLESANO:  Objection.  Mischaracterizes
 5    prior testimony.
 6            THE WITNESS:  The meeting in December was --
 7    the meeting in December was more, from my recollection,
 8    interesting in the standpoint of we were -- the FTC had
 9    reached out.  They had wanted to talk to Ernst & Young
10    directly and see what information we knew about the
11    amount of change that was taking place in Twitter
12    during the month of November after the acquisition and
13    what we were seeing, with the assumption that we were
14    already on the ground and onsite and sort of executing
15    work.
16            As part of that, we informed them that we
17    hadn't actually executed any procedures.  We were
18    having some challenges in tracking down key contacts.
19    The information that we were getting was primarily
20    based from articles in the press, and you know, we were
21    trying to figure out what to do.  And I believe a
22    question was asked "what do you mean trying to decide
23    what to do?"  And we said, "well, we are trying to
24    consider everything from when can we start field work?
25    Where does this reside?  Are they going to fire us?"  I
```

1    mean, we just didn't know.
2         And one of the comments at that point was made
3    that Ernst & Young, under all circumstances, will be
4    conducting and issuing a report on behalf of the FTC
5    order.  So it was sort of like it was very adamant
6    about this is absolutely what you will do and this is
7    going to occur, and you'll produce a report at the end
8    of the day.
9         So for me, that was a bit surprising to be so
10   adamant about that not knowing what could have
11   transpired over the next six to seven months before
12   that report was due.
13        BY MR. KOFFMANN:
14   Q.   Just to be clear, I believe you testified
15   earlier, but correct me if this is not your testimony
16   or if this is not an accurate description of the sense
17   that you got based on your interactions with the FTC
18   but that you had the impression, based on your
19   conversations with the FTC, that the FTC expected that
20   the report that Ernst & Young would issue would
21   conclude or would have findings or, in other words,
22   would conclude that there were deficiencies in
23   Twitter's privacy and information security program?
24        MS. VANDRUFF:  Objection.  Misstates prior
25   testimony.

```
 1              You may answer the question.
 2              MS. COLLESANO:  Objection.  Vague.
 3              THE WITNESS:  You are correct.  I apologize.  I
 4     stopped to see if you had questions and I didn't
 5     finish.  Your broader question of what happened, there
 6     was sort of two meetings.  That was the first one in
 7     December, which was sort of expectations were
 8     definitely set from that meeting.
 9              And then I forget the second meeting we had in
10     January where they were asking about the extent of our
11     procedures and the results.  And at that meeting, I
12     believe, they started providing areas that they were
13     expecting us to look at.  They had given us a list of
14     specificity of the types of procedures they were
15     expecting us to execute, and they also said -- that was
16     the meeting where it was communicated that they would
17     expect Ernst & Young to have findings or exceptions or
18     negative results in certain areas based on what they
19     already understood from an operational standpoint,
20     based on information Twitter had provided, and that if
21     we ended up producing a report that didn't have
22     findings in those areas, that they would be surprised,
23     and they would be definitely following up with us to
24     understand why we didn't -- why we reached the
25     conclusions we did if they were sort of not reflecting
```

Roque

USA v. Twitter, Inc.                                                              6/21/2023

```
 1   gaps in the controls.
 2           BY MR. KOFFMANN:
 3       Q.  So the expectation that the FTC conveyed about
 4   the results of the assessment and what would happen if
 5   Ernst & Young concluded its work without making
 6   findings or exceptions, that was communicated not at
 7   the initial meeting in December, but only at the
 8   subsequent meeting; is that correct?
 9       A.  That's correct.
10       Q.  So let's go back to the December meeting.
11   During that meeting, what was conveyed to you was that
12   the FTC had a definite expectation that Ernst & Young
13   would issue a report; is that correct?
14       A.  That's correct.
15       Q.  And I believe you said before that you found
16   that surprising; is that right?
17       A.  Surprising from the standpoint of there was so
18   much change going on, there was press communications
19   about the company going through and firing a variety of
20   providers on a variety of fronts, that there was -- I
21   don't think it was unreasonable for somebody to come
22   along and say "we are not going to use Ernst & Young
23   for this; fire them and go get somebody else."  It was
24   just speculation, I guess, but the FTC was very adamant
25   that it would be Ernst & Young.  And I sort of stepped
```

1   back and said "a lot is going on; who knows."  I didn't
2   say that to them.  That was sort of what I thought.
3       Q.  Did the possibility that Ernst & Young would
4   not complete the assessment come up at that December
5   meeting?
6       A.  No, I don't believe it did.
7       Q.  Okay.  Anything else that happened in that
8   December meeting that gave you the impression that the
9   FTC had expectations about what Ernst & Young would
10  conclude in its order assessment engagement?
11      A.  Not on a conclusion standpoint in the December
12  the meeting.
13      Q.  Did anything else happen at the December
14  meeting that you would characterize as unusual?
15          MS. VANDRUFF:  Objection.  Vague.
16          You may answer.
17          THE WITNESS:  For me, yes.  There was a level
18  of specificity on the execution of very specific types
19  of procedures that they expected to be performed.  It
20  was almost as if they were giving us components of our
21  audit program to execute.
22          BY MR. KOFFMANN:
23      Q.  And why was that unusual?
24      A.  Because I usually wouldn't have a third
25  party -- well, having a third party is an unusual

```
 1   situation in general for providing a test report.  But
 2   if a third party usually wants a specific procedure
 3   performed, then that type of engagement usually would
 4   not be a testing engagement.  We would call it agreed
 5   upon procedures, where all the parties involved in
 6   getting the report would agree on the specific
 7   procedures to be executed so that they all agree that
 8   they would be done for the particular needs and wants
 9   of the users of the report.
10          The other component of that was a little
11   unusual -- the other component of that report was that
12   the -- our approach is you look at the processes and
13   controls.  So we say, "okay, how does security operate?
14   How does the user administration process manage?  How
15   are changes developed and pushed to production?"  And
16   we look at the controls in those.
17          The requests we were looking at were very
18   specific of, you know, going across the entire service
19   to execute certain commands to make sure certain
20   settings were existing or not, for example.  And as
21   auditors, they are not specifically required or there's
22   a need to based on a perceived risk, we, once again,
23   audit for the processes and controls that mitigate the
24   general risks.  Not going into some of the one-offs,
25   very specific details they were asking us about.
```