# EXHIBIT 13



United States of America
FEDERAL TRADE COMMISSION
BUREAU OF CONSUMER PROTECTION
600 PENNSYLVANIA AVENUE NW, CC-9528
WASHINGTON, DC 20580

Reenah L. Kim
Anne Collesano
Division of Enforcement
(202) 326-2272 (Kim), rkim1@ftc.gov
(202) 326-2485 (Collesano), acollesano@ftc.gov
Erik Jones
Division of Privacy and Identity Protection
(202) 492-0506, ejones2@ftc.gov

July 6, 2023

**VIA ELECTRONIC MAIL**

Daniel Koffmann, Esq. (danielkoffmann@quinnemanuel.com)
Alex Spiro, Esq. (alexspiro@quinnemanuel.com)
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York NY 10010-1601

      Re:    *In the Matter of Twitter, Inc.*, Docket No. C-4316

Dear Counsel:

      We write in response to your June 30, 2023, letter regarding the June 21, 2023, deposition of David Roque at Ernst & Young LLP (EY). In that letter, you raise purported concerns about how the Federal Trade Commission (FTC) is conducting its investigation into X Corp. ("Twitter" or the "Company"). Your accusations of so-called "bullying tactics, intimidation, and threats to potential witnesses" by FTC staff are completely unfounded.

      There is nothing inappropriate in how the FTC has conducted its investigation. For instance, it is not improper for FTC staff to expect that a firm they had approved to serve as an independent third-party professional assessor under Part VI of the Order ("Assessor") would actually conduct an assessment of Twitter's mandated privacy and information security program ("Program") and submit a report of its work on time in accordance with the Order.[1]

---

[1] *See* May 26, 2023, Commission Order in *In the Matter of Twitter, Inc.*, Docket No. C-4316, at Part VI. That Mr. Roque claimed to be "surprised" by this expectation is concerning to us. EY's internal documents suggest the firm was considering the impact to its own reputation if EY were to complete the Twitter engagement and issue a report. *See* Transcript of June 21, 2023, Deposition of David Roque 84:25-85:17 ("If we don't do the work, there is a potential for less impact for Ernst & Young to be associated with the report. . . . [T]here was a possibility that there would be less publicity associated if we didn't ever issue a report.").

July 6, 2023
Page 2

      According to Mr. Roque's testimony and EY's documents, Twitter's delays and failure to provide relevant information and access led to EY's decision to terminate its engagement as Twitter's Assessor. Mr. Roque testified EY was unable to complete its planning or execute any assessment procedures because it lacked the necessary information to do its work. For example, EY repeatedly asked Twitter for key documents such as the complete Program risk and control matrix and Company organization chart. According to Mr. Roque, Twitter provided an interim response on December 1, 2022, indicating most controls had new owners, while other controls did not have owners or were not operating as intended. EY did not receive the final risk and control matrix from Twitter until January 31, 2023. And despite EY's multiple requests, Twitter never provided EY a final Company organization chart, which Mr. Roque said EY needed to facilitate and execute its assessment procedures. Transcript of June 21, 2023, Deposition of David Roque ("Roque Dep Tr.") 136:23-137:3, 137:10-138:25, 140:12-141:1, 142:1-21, 143:22-144-15.[2] In particular, Mr. Roque testified that the degree of change in the Program's control owners—including changes that resulted in numerous controls lacking an identified owner—contributed to EY's termination decision. *Id.* 33:10-35:9.

      Moreover, as of the end of February 2023, EY had been unable to execute any of its field work procedures[3] because, according to Mr. Roque, Twitter indicated it was "not ready" for EY to be onsite – even though their August 2022, statement of work expressly provided EY would begin onsite work in January 2023. Mr. Roque testified EY had been making weekly inquiries starting in December 2022, to obtain access so it could start its field work and commence its testing procedures sooner. *Id.* 25:15-26:25, 27:18-22, 32:18-33:8. For example, as of February 27, 2023, EY had not been able to conduct any interviews of Twitter control owners since October 2022, because Twitter "didn't facilitate us having those interviews." *Id.* 143:22-144-15. Mr. Roque testified it was not until February that Twitter indicated EY might be allowed to begin its field work, but even then, it could commence no sooner than March 15, 2023. *Id.* 27:7-11, 149:23-150:6 ("We couldn't do much without Twitter's assistance. As I shared, they

---

[2] *See* EY_FTC_0000058 (Exh. 11 at Roque Dep.) ("As a result of these extensive departures, and despite our multiple requests, we were unable to obtain key documents such as a final control list or organization chart. As a result, our planning procedures and scoping of the engagement halted for a period of time."); *see also* EY_FTC_0000060 (at the time EY was first engaged as Twitter's Assessor, it was "with the expectation we would complete our work on a timeline which provided earlier access to the control details, owners, and documentation than the revised timeline that Twitter provided in early February. . . . With the significant changes in organizational structure, personnel, the privacy and security control environment, and control owner turnover, we concluded EY would not have a reasonable basis to conclude whether the Company's Report on Management Compliance was in compliance with the requirements of Provision V of the FTC Consent Order.").

      *See also* EY_FTC_0007226 (Exh. 15 at Roque Dep.) (a January 31, 2023, chat thread in which an EY senior manager wrote, "It's almost like, if we can't finish testing all controls because of the delay, we will just need to fail and qualify them.").

[3] According to Mr. Roque, such field work would include direct interviews and performing physical work onsite at Twitter. Roque Dep. Tr. 132:11-133:12.

July 6, 2023
Page 3

proposed mid-March to be in [sic] working, but there was also the possibility, I guess, that they might move it to April 1st. We just didn't know.").[4]

Mr. Roque further testified that significant departures and rapid turnover among key Twitter personnel compounded EY's difficulties. For example, EY's designated primary contact at the Company comprised six different people in two months,[5] including a two-week period in late 2022 when EY was redirected to three different people in rapid succession. *See id.* 31:20-32:12 ("And then when Mr. Cohune left around Thanksgiving in November, he officially communicated to Mr. Baker and EY that that's who we should be working with at that time. Q: Did Mr. Baker provide you with information that you requested?  A: He did not directly. . . . We sent numerous emails to him asking to [] meet with him about the order, introduce ourselves and see if he had any questions about how we could get – how we could proceed or how it would take place, but he never responded back to our emails. And I think within about ten days, he was terminated from the company.  Q: How about [] Sergio Alonso? A: We were informed to work with him after Mr. Baker's departure, but he left the company or was terminated within a week after Mr. Baker.").[6]

According to Mr. Roque, a "significant amount of the executives that were originally familiar with the programs that had been implemented had departed, and as new ones were identified, they also were departing." For instance, the primary executive familiar with the Program and "the entire internal audit team . . . as well as their compliance functions" all left Twitter in November 2022, along with many of EY's "historical security and privacy contacts" at the Company. *Id.* 38:15-40-7, 136:9-21.

Mr. Roque testified that in his conversations with FTC staff, the focus was on getting appropriate information to ensure Twitter's Program mandated by the Order was operating effectively. *Id.* 121:4-8. In other words, the FTC wanted to check that EY was getting the information it needed to do its job as Twitter's Assessor – particularly given all the changes at the Company that were occurring in late 2022.[7]

---

[4] *See also* EY_FTC_0002730 (Exh. 5 at Roque Dep.) (a February 14, 2023, email in which Mr. Roque wrote, "EY does not believe Twitter is currently ready for EY to come on site and begin its fieldwork procedures. We simply cannot do the work.").

[5] From early November 2022 to early January 2023, EY's designated point of contact at Twitter cycled through Damien Kieran, Brett Cohune, Jim Baker, Sergio Alonso, Damien Vogt, and Christian Dowell. Roque Dep. Tr. 30:3-13.

[6] Twitter did not inform EY of Mr. Baker's termination; EY learned about it through press reports. *Id.* 163:18-164:3. *See also id.* 164:10-15 ("Q: Did Mr. Alonso confirm that was the situation at Twitter with Mr. Baker?  A: I don't believe he actually ever responded because he himself left within four or five days after Mr. Baker's termination.").

[7] During a November 2022 discussion with EY in which Mr. Roque did not participate, FTC staff relayed to EY that they were concerned about EY's fact-finding process and the speed with which EY would be able to determine what was happening at Twitter – but not about the outcome. FTC staff conveyed that the ultimate objective was for EY to get to the truth.

July 6, 2023
Page 4

Part VII of the Order (Cooperation with Third-Party Assessor(s)) requires that Twitter disclose all material facts to the Assessor and provide or otherwise make available to the Assessor all non-privileged information and material that is relevant to the assessment, including information about the Company's networks, systems, software, and IT assets, so the Assessor can appropriately determine the scope of the assessment.

Upon learning of EY's abrupt termination—a highly unusual development—we had concerns and sought relevant information on the subject. Accordingly, we issued requests to Twitter seeking Twitter's communications with EY and the Company's internal communications regarding EY and the assessment, as well as Twitter's communications with the firm selected to replace EY. *See* March 7, 2023, demand at requests 2, 3, 4. You raised no objections when you responded on March 21, 2023, stating that "The Company is reviewing documents that may be responsive to th[ese] request[s] and will produce any responsive, non-privileged documents on a rolling basis." However, on May 26, 2023, after we sent you a letter seeking an update on those responses, you informed us that Twitter is now refusing to produce the requested communications, an inexplicable reversal from your previous position. We sought those communications to help us ascertain the extent of Twitter's cooperation with the Assessor—cooperation the Order specifically requires—so it is telling that you are now refusing to provide us this information.

In no way did FTC staff ever attempt to "influence" EY to issue a report concluding there were deficiencies in Twitter's privacy and information security program. Contrary to your selective excerpt from the transcript, Mr. Roque testified only about "a conversation where it was conveyed that the FTC would be surprised if there w[ere] areas on our report that didn't have findings based on information the FTC was already aware of, and if Ernst & Young didn't have findings in those areas, we should expect the FTC would follow up very significantly to understand why we didn't have similar conclusions." *Id.* 124:14-21, 201:9-202:1.[8] According to Mr. Roque, during those discussions, FTC staff conveyed concerns about the degree of changes at Twitter and developments revealed in the press that staff wanted to ensure EY considered in its assessment of Twitter's Program. *Id.* 122:25-123:18.

EY's internal documents indicate that EY personnel held similar concerns. For example, in a February 14, 2023, email, Mr. Roque wrote, "Based on information provided to date[,] the

---

[8] The only other meeting Mr. Roque recalled took place in December 2022. According to Mr. Roque, FTC staff "wanted to talk to Ernst & Young directly and see what information we knew about the amount of change that was taking place in Twitter during the month of November after the acquisition and what we were seeing, with the assumption that we were already on the ground and onsite and . . . executing work. As part of that, we informed them that we hadn't actually executed any procedures. We were having some challenges in tracking down key contacts. The information that we were getting was primarily based from articles in the process, and you know, we were trying to figure out what to do. . . . And one of the comments at that point was made that Ernst & Young under all circumstances, will be conducting and issuing a report on behalf of the FTC order. So it was sort of like it was very adamant about this is absolutely what you will do and this is going to occur, and you'll produce a report at the end of the day." *Id.* 199:6-200:12. As noted above, FTC staff's expectation that the Assessor would issue a report on its work is entirely consistent with the Order's requirements.

July 6, 2023
Page 5

report is likely to have numerous findings." EY_FTC_0002730 (Exh. 5 at Roque Dep.). Mr. Roque explained this meant there were gaps in Twitter's controls – for instance, a control was not designed correctly or was not operating properly as intended, or evidence had not been "captured to determine that the procedures had actually been executed based on the control." Roque Dep. Tr. 79:24-80:4, 83:2-7. In a January 18, 2023, email titled "12.22.2022 Meeting between EY & Twitter," an EY senior staff member questioned the state of the Program's compliance. EY_FTC_0001941 (Exh. 14 at Roque Dep.) ("In Jan[uary] – * We need to ask them what they plan to tell the FTC. * If they say it is all working, then we want to test that and go to the FTC and say that they are misrepresenting themselves.").[9]

Given these developments, it is logical for FTC staff to expect that an Assessor's report would address any such areas of concern and explain whether and why those issues would—or would not, as the case may be—constitute gaps or weaknesses in Twitter's program, or otherwise be reported as findings.

As we previously told your client on more than one occasion (both in communications with former Twitter counsel Christian Dowell as well as in a videoconference with Elon Musk), we hold no preconceived notions for the outcome of this investigation. Our only expectation is that any staff recommendation be based strictly on the facts and law. Over the past several years, we investigated numerous privacy and data security issues at Twitter that did not result in enforcement action. We are proceeding with the present investigation no differently than we would any other. Consistent with our obligations, we must be thorough in our discovery of the facts to understand whether the Company has complied with the Order, but the rigor of our examination does not mean we are somehow attempting to "exert improper influence over witnesses in order to manufacture [damaging] evidence" as you so baselessly allege.

Finally, your letter asks that we provide, in less than a week, documents and information in response to more than 13 requests (with sub-parts). Your requests include demands for privileged and otherwise protected information,[10] as well as documents EY produced in response to a third-party subpoena of which you had advance notice.[11] You cite no authority for these requests relating to an active, ongoing investigation. We therefore will not be providing responses. To the extent you wish to seek information directly from Twitter's current or former Assessor (FTI and EY respectively), you are welcome to do so.

---

[9] Mr. Roque testified EY had no basis to validate the accuracy of the January 2023 compliance report that Twitter submitted to the FTC pursuant to the Order. *Id.* 172:24-173:4.

[10] *See, e.g.*, requests 5, 7, 9, 12, and 13 (seeking "all" and "any" "notes, memoranda, communications, documents, or other records that concern, reference, or relate in any way to . . . .").

[11] You received notice of this subpoena via email on March 2, 2023.

July 6, 2023
Page 6

                                      Sincerely,

                                      Reenah L. Kim
                                      Anne Collesano
                                      Erik Jones