1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3        Before The Honorable Thomas S. Hixson, Magistrate Judge

4

5   UNITED STATES OF AMERICA,      )  No. C 22-03070-TSH/
                                   )      23MC80245-TSH
6            Plaintiff,            )
                                   )
7   vs.                            )
                                   )
8   TWITTER, INC.,                 )
                                   )
9            Defendant.            )
    _____ )
10
                                   San Francisco, California
11                                 Thursday, November 16, 2023

12   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
             RECORDING 11:03 - 11:54 = 51 MINUTES
13
    APPEARANCES:
14
    For Plaintiff:              Department of Justice
15                              Civil Division
                                Consumer Protection Branch
16                              450 5th Street NW
                                Suite 6400-S
17                              Washington, DC 20530
                                (202) 598-7566
18                          BY: ZACHARY COWAN, ESQ.
                                LISA HSIAO, ESQ.
19

20   For Defendant:
                                Quinn Emmanuel Urquhart &
21                                Sullivan, LLP
                                51 Madison Avenue
22                              22nd Floor
                                New York, NY 10010
23                              (212) 849-7000
                            BY: DANIEL R. KOFFMAN, ESQ.
24

25            (APPEARANCES CONTINUED ON THE NEXT PAGE.)

2

```
 1  APPEARANCES:  (Cont'd.)

 2  For Ernst & Young
      LLP:                         Kelley Drye & Warren, LLP
 3                                  3050 K Street NW
                                    Washington, D.C. 20007
 4                                  (202) 342-8435
                              BY:   LAURA R. VANDRUFF, ESQ.
 5

 6  Transcribed by:               Echo Reporting, Inc.
                                   Contracted Court Reporter/
 7                                 Transcriber
                                   echoreporting@yahoo.com
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

1  <u>Thursday, November 16, 2023</u>                    <u>11:03 a.m.</u>

2                    P-R-O-C-E-E-D-I-N-G-S

3                         --oOo--

4          THE CLERK:  Calling civil action 22-03070, United

5  States of America versus Twitter, Inc., and civil Action

6  23-80245, X Corp versus Ernst and Young LLP.  The Honorable

7  Thomas S. Hixson presiding.

8      Counsel, please step forward and state your appearances

9  for the record.

10          THE COURT:  Let's start with the government.

11          MR. COWAN:  Good morning, your Honor.  Zach Cowan

12  for the Plaintiff.

13          THE COURT:  Good morning.

14          MS. HSIAO:  Good morning, your Honor.  Lisa Hsiao

15  for the United States.

16          THE COURT:  Good morning.

17          MR. KOFFMAN:  Good morning, your Honor.  Daniel

18  Koffman, Rachel Frank, and Quinn Emmanuel on behalf of X

19  Corp.

20          THE COURT:  Good morning.

21      And do we have counsel for Ernst and Young here?

22          MS. VANDRUFF:  Hi.  Good morning, your Honor.

23  Laura VanDruff on behalf of (indiscernible).

24          THE COURT:  Good morning.

25      X Corp, we are here on your motion, so please proceed.

2

1          MR. KOFFMAN:  Can I approach the lectern?

2          THE COURT:  Yes, please.

3          MR. KOFFMAN:  Thank you, your Honor.

4      We're here under extraordinary circumstances involving

5  uncommon, alarming conduct by a government agency under the

6  auspices of an order that they asked this Court to answer.

7  They came to this Court having settled a dispute with

8  Twitter.  They asked this Court to answer it, and then they

9  have engaged in conduct that strikes at the heart of that

10  agreement.  It strikes at the heart of this Court's order.

11      And I think it's worth -- I know your Honor has read

12  the briefing and is familiar with the issues, but I think it

13  is useful to explain why this is so important and why this

14  is so -- this conduct is so insidious, because the

15  independent assessor provision in the consent order is this

16  -- the independent assessor occupies a special role.  It is

17  supposed to be a neutral third party.  In the FTCs words,

18          "It's supposed to be truly objective,

19          that is unaffected by the interests or

20          litigation positions of either the

21          respondent or the FTC."

22      Those are their words.  And what we now know is that

23  the FTC has violated that provision and that they have

24  corrupted this process.  And the record on this could not be

25  more clear.  The lead engagement partner from Ernst and

3

1 Young testified that he felt as if the FTC was trying to

2 influence the outcome of the engagement before it had

3 started.  He testified,

4       "In some of the discussions that we were

5       having with the FTC, expectations were

6       being conveyed about what those results

7       should be before we had even begun any

8       procedures."

9    He was asked directly,

10       "No one from the FTC directed you to

11       reach a particular conclusion about

12       Twitter's program, correct?"

13    And his response was,

14       "There was suggestions of what they

15       would expect the outcome to be."

16    He testified that,

17       "The FTC had given us a list of

18       specificity of the types of procedures

19       they were expecting us to execute.  And

20       they also said -- that was the meeting

21       where it was communicated that they

22       would expect Ernst and Young to have

23       findings or expectations or negative

24       results."

25    Your Honor, this is devastating.  This is devastating

4

1  evidence.  This is not normal.  This is not routine.  These
2  are not the expectable results of an adversarial litigation
3  as the government now suggests.  This strikes at the heart
4  of the settlement that the parties reached, and it strikes
5  at the heart of an order that they asked this Court to
6  enter.
7        So that's the backdrop for this motion.  And I think
8  it's an important context for these sort of procedural
9  roadblocks that the government tries to erect now, which I
10 want to address in a minute.  But just fundamentally, it
11 cannot be that the FTC can come to your Honor, invoke this
12 Court's authority to order a settlement, violate that
13 settlement through conduct that is beyond the pale, and then
14 say, "Actually, judge, sorry.  We asked you to enter the
15 order, but you have no power to do anything."  That can't be
16 right.
17        So to address the procedural issues and kind of the
18 government's attempt to divest the Court of jurisdiction
19 here, I don't think that these arguments need to detain the
20 Court long.  The consent order on its face is incorporated
21 into the stipulated order.  It was one document.  And that
22 was by design.  They had to do that.  And the reason they
23 had to do that is because they wanted special remedies that
24 only a district court could order.  The FTC can't impose a
25 civil penalty on its own.  It can't obtain an injunction on

5

1  its own.  So it came here, it asked the Court to enforce

2  this -- to enact this settlement and order the settlement --

3  order Twitter -- now X, but at the time Twitter -- to pay

4  the penalty and to be subject to this court ordered consent

5  order, so that later on if the FTC determine that X had

6  violated the consent order, they could come back and seek

7  contempt.  It's what they do.

8      So to say now that, you know, they asked the Court to

9  enter the order, but now when they violated it, you have no

10 power to enforce it, that argument is -- it's incoherent,

11 and it would produce absurd result, because if they

12 determine that X violated the order, they certainly would

13 come back here and say to your Honor, "They violated your

14 order.  Hold them in contempt, compel compliance, impose a

15 contempt sanction."  So when X violates the order, the Court

16 has power.  When they violate the order, the Court doesn't.

17 I admire the creativity of the argument, but I don't think

18 it can withstand scrutiny.

19     So as to the -- this sort of ultimate --

20         THE COURT:  Well, let me ask you a question.

21         MR. KOFFMAN:  Yes.

22         THE COURT:  So on May 26, 2022, I entered the

23 stipulated order, and then the same day the FTC issued its

24 -- the consent order.  What if I completely vaporized my May

25 26 stipulated order?  Would X Corp still be obligated to

6

1  comply with the FTC's consent order?

2          MR. KOFFMAN:  No.  Well, they wouldn't have the

3  remedy that they currently have, which is to come here and

4  ask the Court to compel compliance or to further penalize X

5  for a violation of the consent order.

6      So that's effectively the relief we're seeking and the

7  relief that we believe is justified on the facts as we

8  understand them, which is to say that -- we're not asking

9  your Honor to go rewrite the consent order.  All we're

10 seeking is an order recognizing that having asked this Court

11 to order the consent order, they can't -- and then they

12 engage in the conduct they've engaged in and blatantly

13 violated the order, they can't come back to Court and say,

14 "Judge, they -- X Corp violated the consent order, so

15 therefore you should hold them in contempt, or you should

16 find that this is a further violation of the FTC Act."

17         THE COURT:  Well then let me ask you another

18 question.  If X Corp did violate the consent order, could

19 the government ask me to hold them in contempt?  In other

20 words, does the stipulated order require X Corp, or formerly

21 Twitter, to comply with the FTC's consent order?

22         MR. KOFFMAN:  I have no doubt, your Honor, that

23 that is exactly the relief they would be seeking, because

24 they do it in other cases.  There are other cases where

25 there's a consent order, and the FTC comes back to Court and

7

1  says, "Judge, the defendant violated the consent order.
2  Hold them in contempt."  That's one of the reasons why they
3  went through this procedure.  They didn't have to come to
4  Court.  Recall that the 2011 consent order, there was no
5  district court action.  There was a consent order.  The FTC
6  determined that Twitter had violated the 2011 order.
7  Twitter at the time decided to settle.  They didn't contest
8  it.  And at that point, so that they could get the penalty
9  -- they could get the injunction and have that ability to
10  come back and seek contempt sanctions, that's why they came
11  to district court.  So I have no doubt that at the end of
12  this investigation, that if it's allowed to go on in its
13  present form, they will come back to Court and say, "There
14  are violations of the FTC Act.  They violated the consent
15  order, penalize them, hold them in contempt."
16        So on the merits, on sort of the rupo (phonetic)
17  factors, I think the record here is pretty clear.  This
18  conduct that the FTC has engaged in itself is a changed
19  circumstance under rupo.  It is also probative of the bias
20  and prejudgment of the investigation -- of the FTC's
21  investigation, which itself is also a changed circumstance.
22        The consent order gives the FTC special discovery
23  powers.  It gives them the ability to take these
24  depositions.  It gives them the ability to demand documents
25  and information under penalty of perjury on a 14-day

8

1  turnarounds.  And X has spent millions of dollars complying
2  with those provisions.  I can tell you firsthand experience
3  a year ago, responses due the day before and the day after
4  Thanksgiving, responses due December 23rd, December 27th.
5  Within the first seven weeks after the change in control of
6  Twitter, the FTC had propounded more than 140 requests for
7  documents and information for what we now know is not a good
8  faith compliance examination, but is part of this effort to
9  create a record that will support a preordained outcome.  If
10  that's not something that is substantially more onerous or
11  unworkable, I'm not sure what is.  And certainly X -- if X
12  had known that within five months and after Elon Musk, this
13  (indiscernible) of the regulatory state and a vocal critic
14  not only of the FTC but of the Biden administration, that as
15  soon as he took over the company, they would go from one
16  type of investigation to evidence in search of a result,
17  they never would have agreed to this settlement.  That's not
18  a settlement.
19       So I think on the first two rupo conditions,
20  substantially more onerous or unworkable.  I think these
21  facts clearly support that.
22       Certainly on the third factor, the public interest --
23  at a time, your Honor, when public faith in government and
24  public institutions is at perhaps an all-time low, it cannot
25  be that government agencies can engage in this kind of

9

1  conduct and then continue to enjoy the benefits of orders

2  that they obtained under the authority of an article

3  (indiscernible).  If they don't play by the rules of -- and

4  if they violate their own agreements, then they shouldn't be

5  able to continue to enjoy the benefits of those agreements.

6  And that -- that's what we're asking for.  To be clear,

7  we're not saying they can't investigate X, they can't

8  investigate Elon Musk.  Let them issue a CID.  Let them send

9  out their representative to pose as consumers.

10      We're also not saying that X should have no obligation

11  to have a privacy program.  X has made commitments to users.

12  It has to live up to those commitments, subject to other

13  legal regimes that require privacy and information security

14  protocols.  So we're not saying X should just be able to

15  open the floodgates and let the hackers in, not that at all.

16  And we're also not saying that X should be allowed to

17  violate the FTC Act.  If they want to come to court and say

18  that the company violated the FTC Act, we can litigate that.

19  All we're saying is that the FTC cannot invoke this Court's

20  authority to enforce a settlement that they themselves have

21  violated and continue to abuse in the most unusual

22  circumstance.  Their conduct -- what that conduct means

23  about their investigation means that they cannot invoke this

24  Court's authority to compel compliance or to punish

25  non-compliance with this order.  So -- and that -- I can't

10

1  imagine any legitimate argument that your Honor doesn't have
2  the ability to issue that.
3      Just to touch briefly on the deposition and then the
4  discovery.  So on our motion to quash the deposition of Mr.
5  Musk, I think for all the reasons laid out in the papers and
6  that I've just gone through, I think it follows that this is
7  -- it's both -- part of this improper investigation.  I
8  think it's a tactic.  The guy was on the job for six weeks
9  when they issued the first notice of deposition.  He
10 practically didn't -- he's still trying to figure out where
11 to get a Diet Coke, and they're saying, "We wanted to talk
12 to you."  I don't think that that's right.  I also think
13 that it clearly violates the Apex doctrine.  The government
14 says the Apex doctrine doesn't apply.  That's not correct.
15 The deposition was issued under this Court's name with this
16 case caption.  The Apex doctrine applies to any civil case,
17 and it applies here.  And they clearly have not exhausted
18 alternative avenues to obtain the (indiscernible).
19     On discovery -- I'll sort of put the motion to compel
20 to one side for a minute.  But just to explain what's going
21 on here, this is not a fishing expedition.  We've been able
22 to see only a small sliver of the record here.  It's only
23 the documents that the FTC chose to introduce at the
24 deposition of the E and Y engagement lead.  What we've seen
25 in those documents and in his testimony is evidence that

11

1 there are other conversations going on about positions

2 within E and Y.  So we're just -- we're following the

3 evidence.

4      And one especially important piece of that is the

5 testimony about the second meeting with the FTC that Mr.

6 Roque did not attend.  He testified that only an Ernst and

7 Young in-house counsel attended that meeting.  And, your

8 Honor, we have reason to believe that at that meeting, the

9 FTC continued to dictate what it expected Ernst and Young to

10 do, specific things that it was demanding Ernst and Young do

11 that Ernst and Young said, "We're not prepared to do that.

12 And if you insist that we do it, we would likely have to

13 resign."  And that when Ernst and Young communicated that,

14 the FTC began to threaten them, and said things like, "We

15 don't want to be at odds with you."  So --

16           THE COURT:  So in your papers you refer to Mr.

17 Roque testified about one meeting, but what you're saying

18 now is there was likely another one that he wasn't present

19 at?

20           MR. KOFFMAN:  That's right.

21           THE COURT:  Okay.

22           MR. KOFFMAN:  He testified that he knew that that

23 meeting occurred and that Ernst and Young in-house counsel

24 attended.  And when I sought to examine him about

25 communications that that lawyer may have made to him, purely

1  factual, just repeating what the FTC said, Ernst and Young's

2  counsel objected on privilege ground.  I disagreed with

3  those objections.  We can get into that.  But the point is

4  that we know the meeting happened, and I'm proffering to

5  your Honor that we have reason to believe that the FTC made

6  clear threats during that meeting when E and Y said, "If we

7  -- if you tell us that we have to do this, we may have to

8  resign."

9      So -- again, not a fishing expedition.  And I am

10  confident that -- I think that the record satisfies rupo as

11  it is.  To the extent your Honor is not yet certain, I'm

12  confident that additional discovery about that second

13  meeting will lead to material additional evidence that bears

14  on this question.

15      So I think, as I said, the record establishes gross

16  misconduct by the FTC.  That misconduct easily meets any one

17  of the three rupo conditions.  And so in the exercise of

18  your equitable discretion, what we would seek from your

19  Honor is an order that the FTC cannot obtain relief based on

20  an alleged violation of the consent order.

21          THE COURT:  Okay.  All right.  Thank you.  If you

22  would like -- you want to reserve your remaining time for

23  responding?

24          MR. KOFFMAN:  Please.  Yeah.

25          THE COURT:  Okay.

13

1        Let me hear from the government.

2             MR. COWAN:  May I approach?

3             THE COURT:  Yes, please.

4             MR. COWAN:  Good morning again.  Your Honor, the

5   FTC Act authorizes the FTC at section 5(b) to issue

6   administrative orders requiring corporations to cease and

7   desist from using unfair and deceptive trade practices.  It

8   also authorizes the commission to modify those orders when

9   it determines that it's in the public interest to do so.

10       And in 2022, the FTC did just that.  And it issued a

11  modified administrative order against X Corp with X Corp's

12  consent as a part of the settlement in this lawsuit.  But

13  now, your Honor, using Rule 60(b), X Corp seeks to revoke

14  that consent and evade the settlement agreement and the

15  administrative process to which it agreed just one year ago.

16  It cannot do so for three reasons.

17       First, your Honor, an administrative order can't be

18  modified under Rule 60(b).  Congress specified another

19  pathway under the FTC Act whereby a petitioner must go to

20  the commission and ask to have the order modified or vacated

21  with judicial review occurring of that decision thereafter.

22       Second, your Honor, and regardless, X Corp's

23  contentions fail to meet the threshold showing required

24  (indiscernible).

25       And, finally, X is not entitled to a protective order

14

1  to stop Mr. Musk's depo because he has firsthand knowledge

2  about evidence that is highly relevant to the FTC's

3  investigation.

4          THE COURT:  Let me ask you a question.  If the FTC

5  thought that X Corp violated the FTC's administrative order,

6  could you ask me to impose contempt sanctions?

7          MR. COWAN:  Not as a part of this lawsuit, your

8  Honor.  And -- now, perhaps under section 5(l), they could

9  bring another lawsuit.  But if it's purely under the

10 administrative order, the Supreme Court has been pretty

11 clear about this that you cannot.  And so this came up on

12 reply, so the government hasn't really had an opportunity to

13 address this.

14     So I just want to clarify a couple of points there.

15 First of all, it has happened before where there has been

16 concurrent administrative and judicial proceedings in

17 connection with the same administrative order.  So one

18 really good example of that is the Louisiana-Pacific cases

19 that occurred in the Ninth Circuit and where the case was

20 remanded back to the agency to make particular findings,

21 recognizing that there's that parallel track that's

22 occurring between the two cases.  So just -- that is a

23 baseline.

24     But then, your Honor, there is a case called Kokkonen,

25 which is very clear -- and I brought a courtesy copy for

15

1  your Honor to the extent that your Honor would like it.  The
2  Supreme Court has been very clear that the jurisdiction of
3  courts to enforce the settlement are limited by the terms to
4  which the parties agreed.  So there's three cases that I
5  would point your Honor to.  One is Kokkonen.  And, again, I
6  could give you copies, and I have copies for counsel as
7  well.  But that 511 U.S. 380 and 81, Pigford, which is a
8  D.C. circuit case, 777 F.3d 514, and Kelly, which is a Ninth
9  Circuit case, 822 F.3d 1095.  All of these cases stand for
10  the proposition that the Court's jurisdiction to limit -- to
11  enforce settlement agreement is limited to the express terms
12  to which the parties agreed.
13      Section four is the retention provision of the
14  stipulated order.  And that provision is very clear that the
15  Court retained jurisdiction to enforce the stipulated order,
16  not the administrative order or the administrative
17  proceedings that were listed elsewhere in the order which
18  were in section two.  And this was a very intentional
19  decision by the parties.  Section two through section two,
20  the parties requested, and the Court ultimately ordered,
21  that X shall consent to reopening of the administrative
22  process and a modification as set forth in attachment A.
23          THE COURT:  In other words, is it the government's
24  view that this is not a judicially supervised consent order?
25          MR. COWAN:  That -- the administrative order is

16

1   not, your Honor.  Not in that respect.  Now, for example, if

2   X Corp had refused to provide consent to enter the order

3   after --

4           THE COURT:  Oh, sure.  Because that's in the

5   stipulated order, yeah.

6           MR. COWAN:  Exactly, yes.  Something would have to

7   be precisely in the stipulated order.  And attachment A was

8   incorporated for more limited purpose such as that we just

9   discussed, your Honor.  So, yes, unless it was somehow

10  violative of something that was particularly in the

11  stipulated order, the parties chose to use the

12  administrative process that Congress provided under the FTC

13  Act.

14          THE COURT:  And the stipulated order does not say

15  that Twitter must comply with the consent order, correct?

16          MR. COWAN:  That's right.  And, your Honor, this

17  was done also for very a intentional reason.  Similar to

18  what happened when this lawsuit was filed, now one potential

19  benefit of having a new administrative order issued was that

20  under section 5(l), to the extent that X Corp failed to

21  comply, the government could seek a new lawsuit, including

22  for civil penalty or for injunctive relief or whatever else,

23  pursuant to that statute.

24      So there are benefits to perhaps using either pathway,

25  including contempt if it would have been in the stipulated

1 order.  As counsel mentioned it, sometimes the government

2 does use a stipulated order to bring contempt actions.  But

3 to the extent that it's an administrative order, the pathway

4 would be through section 5(l) of the FTC Act to bring a new

5 action.

6      So, your Honor, that essentially explains our position

7 with the stipulated order.  And would you like a copy of the

8 cases that I mentioned?

9           THE COURT:  I don't think I need copies of cases

10 that stand for the proposition that parties are bound by the

11 terms that they agreed to.

12           MR. COWAN:  Okay.

13           THE COURT:  I've got that --

14           MR. COWAN:  Understood --

15           THE COURT:  -- proposition.

16           MR. COWAN:  Understood.  Just moving now to the

17 second argument in terms of Rule 60(b), essentially X Corp

18 relied on changed factual circumstances to suggest that the

19 order should be modified.  Those are -- there are three

20 elements to a 60(b) request for modification.  One, you have

21 to show a significant change in the circumstances.  It has

22 to be onerous.  You have to make compliance more onerous or

23 against the public interest or unworkable.  And finally --

24 but you have to show that that change is suitably tailored.

25      I want to start with the tailoring component and the

18

onerous component because there's -- X devote essentially
very little argument to either.  In terms of the tailoring
argument, your Honor, X Corp really doesn't argue at all
that its proposed modification of the complete termination
is tailored to the circumstance.  And, in fact, its reply
almost implicitly concedes that that wouldn't be
sufficiently tailored because finally on reply, it says
perhaps the Court should just remove the assessment
provision and the compliance monitoring provision.  But even
that argument doesn't really explain how that modification
would be tailored.  In terms of the assessment, X Corp is
essentially on (indiscernible) on the new assessment to say
that it's fully vindicated.  So if it truly didn't believe
that it could get an independent assessment, then it
wouldn't -- then perhaps that isn't appropriately tailored.

But the other one, your Honor, in terms of discovery,
the FTC also has power under its own administrative powers
to issue civil investigative (indiscernible) and so forth to
obtain discovery as a part of its administrative
investigation.  So it's unclear how even removing that
provision would be suitably tailored to fix the problems of
which it (indiscernible).

Essentially, the unworkability argument suffers from
the same flaw, mostly conclusory.  And to the extent that
the -- that X Corp claiming that the FTC's discussions with

1  EY had been (indiscernible) tainted the investigation --

2  it's hard to reconcile that with the reliance on the new

3  report as a part of its position in this case.

4      There was some mention today also of a modification

5  being in the public interest.  I just want to be clear, just

6  as the Second Circuit said when Mr. Musk filed for

7  modification against the FTC, there are benefits, first of

8  all, in enforcing consent decrees.  The public interest is

9  in enforcing consent decrees.  And, also, there's a public

10 interest in following the law and ensuring the laws are

11 enforced here.  And that would be laws protecting against

12 unfair and deceptive trading practices.

13     Finally, just to go to the first element for a few

14 minutes in terms of factual circumstances, they've

15 essentially relied on two bulk reasons that there should be

16 modifications.

17     The first deals with Mr. Roque's testimony.  Honestly,

18 your Honor, reading it, it appears to be a hyperbolic spin

19 on the testimony.  I mean, there -- Mr. Roque at the

20 testimony, after being examined by Mr. Koffman as well, was

21 very clear that in December 2023, FTC was very clear that

22 they expected him to issue a report -- that EY issue a

23 report.  And also they requested specific procedures that

24 would be a part of that.  The January 2023 meeting also said

25 the FTC said, based on a full investigation, it would be

20

1   surprised and would follow up if they didn't find some

2   adverse findings.

3        Your Honor, there's nothing in the order that would

4   prohibit those communication.  There's nothing that says the

5   FTC can't communicate its expectations.  And that is

6   consistent with the administrative order.  One, the FTC's

7   right to approve the assessor seems to imply that it can

8   expect (sic) that accessory issue an order.  And second, the

9   assessor is specifically required to give evidence and

10  explanation for what justifies its finding.  There's nothing

11  inconsistent with the FTC providing its expectation about

12  what sort of evidence might meet that standard.

13           THE COURT:  Well, let me ask you this, even if the

14  FTC's conduct did not violate the administrative order, is

15  this -- in your experience, is this type of expectation

16  setting by the FTC to an independent assessor, is that

17  common?  Is that not common?  Mr. Roque seemed to think it

18  was unusual, but maybe you have more experience in that

19  area.

20           MR. COWAN:  Well, your Honor, what I would say

21  about that is I think it is common, particularly from the

22  perspective of a lot of the times when you have an

23  independent assessor, there are communications that go both

24  ways, both with the government and both with, you know, the

25  person who is being assessed.  I think it's pretty common

1  for -- and I'm sure -- you know, I can't personally speak

2  for what communications X has had with the assessor on this,

3  but I'm sure X had its own communications in terms of what

4  its expectation of procedures would be and what perhaps its

5  finding too that -- it would expect that everything would be

6  above board.  I think those sort of communications aren't

7  that unusual for the FTC or for another party to propose,

8  here are ways you could go about something, and here's what

9  we expect you to find.

10       So -- I mean, just one last point on this, your Honor.

11  It's unclear why this -- all of this appears to be new at

12  the end of the day.  I mean, to the extent that there was

13  some influence over EY, EY has now resigned.

14            THE COURT:  Can you remind me who the new assessor

15  is?

16            MR. COWAN:  It's FTI.

17            THE COURT:  Okay.  All right.

18            MR. COWAN:  And so -- and there's no allegation

19  that the FTC has influenced FTI in the papers.  I mean, just

20  briefly to touch on the other bucket, which is the

21  discovery, your Honor.  The discovery request seem

22  completely reasonable in light of what X Corp characterized

23  as a fundamental transformation that occurred after Mr. Musk

24  took over.  And I don't need -- I won't, unless your Honor

25  really would like me to go through the full list of all of

22

1  the changes that have occurred.  But I will just say that it

2  appears that Mr. Musk has been the driving force behind

3  numerous changes at X Corp.  On reply, X Corp seems to

4  suggest that some of this testimony was elicited by asking a

5  lot of questions about Mr. Musk, but that, in effect, is a

6  way to sidestep the reality that the testimony shows that

7  Mr. Musk has been the driving forth behind those changes.

8          THE COURT:  Is the FTC seeking his deposition as

9  part of this lawsuit or as part of the administrative

10  proceeding before the FTC?

11         MR. COWAN:  No, your Honor.  If you read the very

12  first line of that order, that is pursuant to the

13  administrative order, and that's entirely consistent with

14  both the clear stipulated order and the administrative order

15  in terms of the allocation of powers.

16         THE COURT:  In the government's view, do I have

17  discretion to block Musk's deposition, or is it your view

18  that I am powerless to do so because it's occurring in an

19  FTC proceeding?

20         MR. COWAN:  That's right, your Honor.  Because

21  it's -- under Kokkonen, that wouldn't be a part of this

22  lawsuit.

23      And just briefly, your Honor, I can touch on Mr. Musk's

24  testimony as well.  Again, I think as I just said, the

25  deposition is a part of the administrative -- pursuant to

23

1  the administrative order.  And so for all of the reasons

2  we've already discussed, that is separate from this Court's

3  (indiscernible).  But even putting that aside, in terms of

4  the Apex doctrine too, there's just no authority, and X Corp

5  hasn't cited any authority where that's been applied to an

6  FTC investigation.  And it's clear this is an investigation.

7  There are not active claims or defenses in this case at this

8  point.  It's looking into conduct that has occurred since

9  the transformation -- the fundamental transformation that X

10 Corp self-described involving Mr. Musk.

11      With these briefings, your Honor, unless you have any

12 more questions, I -- we would ask that you rule in favor of

13 the government and deny the motion.

14          THE COURT:  All right.  Thank you.

15      X Corp, because you're the moving party, I want you to

16 have the last word, but -- so that means I'll invite Ernst

17 and Young --

18          MS. VANDRUFF:  Your Honor, would you like for

19 Ernst and Young to be heard?  I wasn't anticipating that the

20 counsel for Twitter would address the motion to compel

21 during (indiscernible).  I'm happy to be heard whenever your

22 Honor (indiscernible).

23          THE COURT:  I think now is a good time.

24          MS. VANDRUFF:  Thank you, your Honor.

25          THE COURT:  And then X Corp, you can respond to

24

1 both arguments at the end.

2         MS. VANDRUFF:  Thank you, your Honor.  Laura

3 VanDruff with Kelley Drye on behalf of Ernst and Young.

4         THE COURT:  Good morning.

5         MS. VANDRUFF:  Good morning, your Honor.  So it's

6 worthwhile just at the outset to remind your Honor how we

7 got here on the motion to compel Ernst and Young.

8    So three weeks after Twitter filed its Rule 60 motion

9 before this Court, Twitter served Ernst and Young with its

10 subpoena.  Both Ernst and Young and Twitter have offices in

11 San Francisco, but counsel for Twitter made the subpoena to

12 Ernst and Young returnable in Washington D.C.  So as a

13 result, when Ernst and Young and Twitter were unable to

14 reach an agreement for substantive reasons we can address

15 here, Twitter moved to compel in the district of -- the

16 district court in D.C.

17    So it never sought leave of this Court to obtain

18 discovery of Ernst and Young, which is a non-party, to be

19 clear, even though it had previously sought leave of this

20 Court in its Rule 60 motion to obtain discovery of the

21 Federal Trade Commission.  And EY -- Ernst and Young opposed

22 the subpoena for a variety of reasons, including that --

23 well, chief among them because it didn't have a legal basis.

24 So Judge Berman Jackson in a DDC transferred to this Court

25 with the parties' consent.  And then Judge Kang, of course,

25

1  referred the matter to you.  So there are a number of

2  reasons that we oppose the subpoena and that we find it to

3  be burdensome.  But I do want to address Mr. Koffman's

4  arguments.

5      Now, counsel for the -- for Twitter -- well, let me say

6  this, that the -- at the deposition, which went a full day,

7  of Mr. Roque, counsel for the FTC -- and it was on the

8  counsel for the FTC's deposition notice, of course, the

9  subpoena -- Rule 45 subpoena for his deposition.  A key

10 focus of the examination were the reasons for Ernst and

11 Young's termination of its engagement.

12     And I turn the Court's attention to Exhibit E, to our

13 opposition, which is an internal document.  And it is under

14 seal, but it -- it's, of course, in our filing.  And it

15 describes Ernst and Young's decision to terminate.  It's an

16 internal memo that predates, of course, the submission.  And

17 it describes the business reasons that Ernst and Young

18 decided to terminate.  And none of them even allude to what

19 Mr. Koffman described here.  Rather, it describes the

20 departure of Twitter employees responsible for privacy and

21 information security program, the availability of Twitter

22 employees with subject matter expertise, the impacts of

23 significant organizational changes at Twitter, and delay to

24 the project timeline requested by Twitter.

25     So -- you know, I submit, your Honor, that if -- that

1  the issues raised by Twitter's motion to compel Ernst and

2  Young are subsidiary to the issues raised by the Rule 60

3  motion and that your Honor's decision in the Rule 60 motion

4  and the subsidiary motion that relates to discovery really

5  do moot the issues here because, as Twitter raises in its

6  briefing relating to Ernst and Young, it would have been

7  satisfied with the documents that Ernst and Young provided

8  to the FTC.  Those documents are equally available.  If it

9  were to serve discovery on the FTC and if your Honor permits

10 discovery of the FTC, it can obtain those documents there.

11 For those reasons, Ernst and Young opposes -- continues to

12 oppose the subpoena served on EY.  Thank you, your Honor

13         THE COURT:  Thank you, counsel.

14     All right.  X Corp, let's hear from you.

15         MR. KOFFMAN:  Thank you, your Honor.

16     I'll start with the -- responding to some of the

17 government's arguments.

18         THE COURT:  Why don't we begin with the big one,

19 the government's assertion that if X Corp violated the FTC's

20 consent order, the government could not seek contempt

21 sanctions in front of me.

22         MR. KOFFMAN:  I don't know what to make of that,

23 your Honor.  That's just so contrary to what I've seen the

24 FTC do in other matters where there's a consent order is

25 they've come back to the Court that entered that order and

1 sought contempt.  So if they want to say that they don't

2 have the power to do that, then I think that that's a

3 significant concession.  I don't think it's dispositive

4 because, ultimately, the consent order is part of the

5 stipulated order.  It is clearly integrated into that

6 document.  And they  -- there was some discussion about, you

7 know, parties ought to be bound by the terms of their

8 contracts.  Well, attachments to contracts are a part of

9 contracts.  That's sort of a fundamental concept.  So --

10        THE COURT:  I was rereading the stipulated order,

11 and I can't find any language in it that requires Twitter to

12 comply with the FTC's consent order.  Do you think I'm wrong

13 about that?  And if so, you could direct me to that

14 language, but I don't see ordering language in there to that

15 effect.

16        MR. KOFFMAN:  So I don't think that the -- there

17 is no sentence that says, "Twitter is enjoined to comply

18 with each and every term of the consent order."  However,

19 obtaining an injunction to comply with the consent order was

20 the reason that they came here.  That was one of the

21 remedies Mr. Cowan alluded to or he had said the FTC has the

22 power to issue cease and desist orders.  If it wants

23 anything more -- if it wants a civil penalty of, like, $150

24 million or if it wants an injunction that is enforceable

25 with contempt -- the contempt power of the Court, it has to

28

1  come to the Court.  So that's what they did.  So I'm a

2  little mystified by they're now saying, "Well, judge, you

3  know, there's -- that's a separate thing, and you didn't

4  really order that, and we can't enforce it."  I find that to

5  be totally at odds with what I understand to have happened

6  here and what I've seen the FTC do in other cases.

7      So -- and I think Mr. Cowan alluded to that, excuse me,

8  when he was talking about the remedies that the FTC could

9  seek.  He said, "Well, if they violate the consent order --

10 X violates the consent order, then the FTC can come back and

11 seek a civil penalty or an injunction or whatever else."

12 Those are his words.  The "whatever else" is a contempt

13 sanction from this Court.  It's asking this Court to compel

14 compliance on pains of contempt.

15     THE COURT:  In the other situations that you

16 described where you saw the FTC move for contempt, was the

17 language in the Court's order different?  Did it have

18 language in the Court's order that specifically ordered

19 compliance with the FTC order?  Or maybe you don't know the

20 details of those cases?

21     MR. KOFFMAN:  I don't have those in my fingertips.

22 I'm happy to submit something afterwards if it would be

23 helpful to the Court.  But let me also just say, this is all

24 kind of beside the point.  We're not -- and this sort of

25 parallel administrative judicial track is also beside the

29

1   point for the same reason, which is, we're not asking the

2   Court to rewrite the terms of the consent order.  What we're

3   seeking is an order from the Court saying, "You FTC cannot

4   come back to me to seek my help forcing X to comply with

5   this consent order.  The circumstances have changed.  Your

6   conduct is a changed circumstance.  You've rendered

7   compliance with this consent order substantially more

8   onerous, unworkable, and it would be against the public

9   interest to give you the benefits of the consent order when

10  you're engaging in this conduct that violates the consent

11  order."  That doesn't implicate whether the consent order is

12  part of the stipulated order.  It is, but that's sort of a

13  separate issue.

14          THE COURT:  So my understanding under the

15  stipulated order is that there's only one very indirect way

16  that I could enforce the consent order, and that's the

17  stipulated order gives DOJ the right to access certain

18  documents that it otherwise wouldn't be able to because the

19  consent order otherwise only obligates X Corp to provide

20  them to the FTC.  So I suppose if DOJ were being denied

21  access, they could ask me to order access.  But other than

22  that, I think X Corp is likely already in this situation

23  where I couldn't enforce the administrative order or issue

24  contempt sanctions, just because I don't see anything in the

25  stipulated order that obligates Twitter to comply with the

1  consent order.

2      So in some ways, the relief that you say today at this

3  hearing that you want, maybe you already have.

4          MR. KOFFMAN:  I'm heartened to hear the Court say

5  that.  I appreciate Mr. Cowan's concession that they're --

6  they can't seek contempt.  But I don't think it's -- I don't

7  think it's the relief -- it's entirely the relief we're

8  seeking, because what he did say is that if the FTC

9  determines that X violated the consent order, they're going

10  to seek new remedies.  They're going to seek --

11          THE COURT:  Well -- but he said that would be in a

12  new lawsuit.

13          MR. KOFFMAN:  Well, that may be.  I don't know.  I

14  don't think there would be -- I think they would probably

15  amend their complaint in this case in the same way that they

16  amended their consent order in the prior matter, and it's

17  all part of the same docket.  I don't know.  That would be

18  up to them.  But to the extent that they come back to the

19  Court seeking remedies for violation of the consent order, I

20  think it is squarely within this Court's power to decline to

21  provide them those remedies.

22      A few other points just to respond briefly, on the

23  tailoring issue, as -- Mr. Cowan, to his credit,

24  acknowledged that we did identify ways that would be more

25  tailored.  We think that we're entitled to the entire

1  relief, but the independent assessor provisions and the

2  discovery provisions, the reason that that is more narrowly

3  tailored is because those are the provisions that the FTC

4  has been (indiscernible), and those are the ones that have

5  imposed these acute burdens on X Corp.

6      And as to this notion that, you know, we -- X Corp has

7  not been harmed and that because they got a substitute or

8  replacement independent assessor that issued a clean bill of

9  health, I don't think that that stands up to scrutiny.

10 There's the obvious due process violation that is ongoing

11 with a government agency engaging in this kind of conduct.

12 There's the millions of dollars that X has spent responding

13 to discovery demands.  There's also the substantial amount

14 of new money that X Corp had to pay to get a new assessor up

15 to speed at warp speed to be able to do the independent

16 assessment.  So I don't think that that stands up to

17 scrutiny.

18     Mr. Cowan offered what I take is an attempt at

19 defending the conduct.  He said that we had applied some

20 hyperbolic spin.  I mean, I read the transcript a few

21 minutes ago.  I don't think it needs any spin.

22         THE COURT:  Well, what's been your experience?

23 Mr. Cowan said that this type of expectation setting is not

24 necessarily unusual.  Do you have a different view about

25 that?

1    MR. KOFFMAN:  I absolutely do.  I am -- if this is
2 normal -- if this is consistent with a consent order that
3 requires an independent assessment, the word "independent"
4 has no meaning.  To say, "I felt as if the FTC was trying to
5 influence the outcome of the engagement before it had
6 started," under no set of circumstances is that normal or
7 acceptable.  And if it is normal for the FTC, then maybe we
8 have a much, much bigger problem.  I hope that this is just
9 a one-off case.  But that, I don't think, can be accepted.

10    THE COURT:  Well, Mr. Roque thought it was -- or
11 testified that it was unusual.  Did he have experience in
12 these type of matters?

13    MR. KOFFMAN:  I asked him that.  He said that this
14 was -- he -- this is the only engagement that he has dealt
15 with that involved an independent assessment being appointed
16 by a governing agency.  He did say for what it's worth that
17 he never heard of anything happening like this before, but
18 in their -- in defense of the FTC, he didn't really have a
19 significant basis (indiscernible).

20    There was a suggestion that, "Well, the FTC is
21 permitted to communicate with the assessor.  I'm sure that X
22 Corp had communications with E and Y."  Judge, can you
23 imagine if there were evidence that X Corp had been exerting
24 pressure on E and Y and saying you're only allowed to do X,
25 Y, and Z, and I expect this to be a clean bill of health?

1  My God.  If the roles were reversed, it's beyond imagination

2  what they would be saying.  They would -- I'm reasonably

3  certain they would have made a criminal referral for

4  contempt of Court and other sanctions.  Obstruction, for

5  example.  So I don't think that that stands up to scrutiny

6  either.

7      And, finally, on the deposition, there was some

8  discussion about whether this was pursuant to the FTC's

9  administrative power or this Court's power.  Your Honor, we

10  included in the record the deposition notices.  They say

11  District Court, Northern District of California.  They have

12  this case caption.  I'm not sure how they can say that it

13  was not issued in the context of this lawsuit or under the

14  authority of this Court.  So I think that also fails.

15      On -- unless you have any questions, I'll move to the

16  motion to compel.

17          THE COURT:  I don't, so please go ahead.

18          MR. KOFFMAN:  So Ms. VanDruff referred to the fact

19  that the subpoenas were returnable to the District of

20  Columbia.  I'm not sure what the point was there.  But to

21  the extent your Honor wants to know --

22          THE COURT:  Presumably that's where the documents

23  were.

24          MR. KOFFMAN:  Well, it's not where the documents

25  were.  It's where our associates were who would be receiving

34

1    the documents.

2              THE COURT:  That issue doesn't matter to me.

3              MR. KOFFMAN:  Okay.

4              THE COURT:  But it made its way to me.  So here we

5    are.

6              MR. KOFFMAN:  Ms. VanDruff made an argument or

7    reference to the fact that we had sought leave to take

8    discovery from the FTC and that that somehow was a

9    concession of some sort.  I'm not sure what we're supposed

10   to have been conceding there.  But to the extent that

11   matters to your Honor, I think the papers are clear.  We

12   sought discovery from the FTC before we made the motion.

13   They said, "No, go pound sand."  And so we said to your

14   Honor, "You ought to compel them to respond to the

15   discovery, to the extent you're not satisfied on the record

16   as it is."  So I'm not sure that that really makes a

17   difference.  And then there was a reference to the fact that

18   the record suggests that E and Y terminated or resigned as

19   the assessor because of Twitter's -- X Corp's inability to

20   supply the resources needed to conduct the assessment.  This

21   is completely irrelevant to the discovery we're seeking and

22   why we're seeking it.  And I explained earlier, it's because

23   there's significant evidence in the record, the limited

24   record that we have so far, suggesting that the FTC has

25   engaged in extraordinary misconduct and seeking to weaponize

1  an independent assessor by twisting their arm.  Why E and Y

2  resigned is really neither here nor there.  But I will say

3  that -- and as I proffered --

4          THE COURT:  I felt like there was at least some

5  suggestion in your motion that maybe the true reason for the

6  resignation was the alleged bullying and intimidation?

7          MR. KOFFMAN:  And -- yes, there is some

8  suggestion.  And I proffered to your Honor before what I

9  believe the discovery would show about that other meeting,

10  that when told again what to do by the FTC, E and Y said,

11  "If that's what you want us to do, we would probably have to

12  resign."  And I think the fact -- and look, I get it.  I

13  don't blame Ernst and Young for not wanting to be here.  We

14  don't want to be here either, your Honor, but we didn't

15  bring us here.  It was the FTC's conduct that brought us

16  here, and we're following the evidence where it goes so that

17  we can figure out what happened here and what the remedy is.

18          But the -- so the fact that Ernst and Young's formal

19  memorandum put all the blame on Twitter is equally

20  consistent with the coercive conduct by the FTC succeeding

21  and them being afraid of being at odds with the FTC and

22  knowing that this may become subject to discovery and

23  wanting to have a record that doesn't blame the FTC because

24  they continue to do business with the FTC.

25          And this is not wild speculation.  There's in the

36

 1  record, and it's -- I don't have my fingertips where it is

 2  in the record, but I can find it in a second.  But we

 3  included an instant message communication between Mr. Roque

 4  and another managing director from Ernst and Young talking

 5  about the resignation.  And what one of the managing

 6  directors says -- what he says to Mr. Roque is,

 7              "I think you need to play out that

 8              scenario.  As I noted in my e-mail last

 9              night, I think the FTC will cure both of

10              those objections.  Then our veil will be

11              gone, and it will be clear we are

12              resigning just because we don't want to

13              be involved, not the two cited reasons."

14       So -- I mean the notion that E and Y can rely on a

15  memorandum when we have evidence that they're engineering

16  what's going to go on that memorandum is, I think, not sound

17  reasoning.

18       Again, it's really not the point.  The point is that

19  they have material additional evidence that bears directly

20  on the issues that are before the Court.  And to the extent

21  the Court is not prepared to issue the order that we've --

22  that we're seeking right now, at a minimum, we ought to have

23  an opportunity to pursue this.

24              THE COURT:  Alrighty.  Well, thank you, counsel.

25       The matter is submitted, and we're adjourned.

37

1        MR. KOFFMAN:  Thank you, your Honor.

2        THE CLERK:  Thank you, everyone.  We're off the

3   record.  The court is in recess.

4     (Proceedings concluded at 11:54 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

38

CERTIFICATE OF TRANSCRIBER

1

2

3      I certify that the foregoing is a true and correct

4 transcript, to the best of my ability, of the above pages of

5 the official electronic sound recording provided to me by

6 the U.S. District Court, Northern District of California, of

7 the proceedings taken on the date and time previously stated

8 in the above matter.

9      I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties to the action

11 in which this hearing was taken; and, further, that I am not

12 financially nor otherwise interested in the outcome of the

13 action.

14



15

16

17      Echo Reporting, Inc., Transcriber

18           Saturday, November 18, 2023

19

20

21

22

23

24

25